UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SHAWN C. REX, | CASE NO. 3:23-CV-01017-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Shawn Rex challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On May 19, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated May 19, 2023). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

## PROCEDURAL BACKGROUND

Mr. Rex initially filed for DIB and SSI on May 16, 2017, alleging a disability onset date of September 30, 2016. (Tr. 227, 234). The claims were denied initially and on reconsideration. (Tr. 77-110, 113-50). Mr. Rex then requested a hearing before an Administrative Law Judge. (Tr. 168-70). Mr. Rex (represented by counsel) and a vocational expert (VE) testified before the ALJ on

1

April 5, 2019. (Tr. 40-76). On May 29, 2019, the ALJ determined Mr. Rex was not disabled. (Tr. 16-37). The Appeals Council denied Mr. Rex's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3). Mr. Rex then appealed to this Court and his case was remanded to the Commissioner. (Tr. 1606).

After remand, a second hearing was held before an ALJ on June 7, 2022. (Tr. 1488-1526). On August 1, 2022, the ALJ again determined Mr. Rex was not disabled. (Tr. 1429-59). Mr. Rex raised error with this decision, but the Appeals Council declined jurisdiction on March 21, 2023; thus, the ALJ's decision of August 1, 2022 is the final decision of the Commissioner. (Tr. 1422; *see also*, *e.g.*, 20 C.F.R. §§ 404.984; 416.1484). Mr. Rex timely filed this action on May 19, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.  PERSONAL AND VOCATIONAL EVIDENCE

Mr. Rex was 42 years old on the alleged onset date, making him a younger individual under the regulations. (Tr. 1457). He graduated high school, and previously worked as a rough carpenter, finish carpenter, carpenter supervisor, and nailing machine operator. (*Id.*).

## II.  RELEVANT MEDICAL EVIDENCE[1]

On June 6, 2016, Mr. Rex presented to the emergency department status post syncopal episode; he reported that he had been backing his car out of the driveway and ended up in the parking lot across street. (Tr. 520). He also reported a one-minute episode the day prior where he

---

[1]  Mr. Rex only alleges error as to whether the ALJ's residual functional capacity determination adequately accounted for his severe seizure disorder. (ECF #8, PageID 2933, 2940-45). I therefore summarize only those medical records relevant to his seizure disorder and related mental health issues affecting his medication compliance, all other errors being waived.

felt disconnected from his body but he could not control himself; he was shaking and could not move his arms but he was awake. (*Id.*). He was discharged with referral to his primary care provider. (Tr. 522).

On June 24, 2016, Mr. Rex reestablished care with Warren Morris, M.D., after reporting to the emergency department recently for a syncopal episode or seizure activity. (Tr. 366-67). He reported having episodes where he goes blank, stares, and does not respond to anyone. (Tr. 367). The emergency department testing was normal and referral to neurology was suggested to him. (*Id.*). He had an abnormal EKG and he was referred to a new cardiologist. (*Id.*). He was diagnosed with absence seizure. (Tr. 369).

On July 19, 2016, Mr. Rex established behavioral health care with Amy Freeman, LISW. (Tr. 375). He reported a history of depression, alcohol use, and substance use that had previously been treated with medication, outpatient counseling, psychiatry, and community-based support groups, although he was not currently utilizing any of these supports. (*Id.*). On examination he demonstrated questionable judgment, had some insight, his affect was within normal limits and his mood euthymic. (Tr. 376). He was diagnosed with major depressive disorder, cannabis abuse, alcohol abuse, and cigarette nicotine dependence; anxiety disorder was ruled out. (Tr. 377). He was instructed to take his medications as prescribed with a note in all caps stating "EVEN IF YOU FEEL BETTER" and reminding that side effects usually go away in a few days, "TRY TO STICK IT OUT!" and if antidepressants are prescribed, they only work if taken "EVERY DAY!" (*Id.*).

On August 31, 2016, Mr. Rex met with Ali Almudallal, M.D., for evaluation of altered awareness, with the first event occurring two months prior when he backed out of the driveway without knowing where he was. (Tr. 345). His girlfriend reported he had been having staring spells

two to three times daily in which he was unresponsive, had a shaking right hand, and was confused afterward. (*Id.*). He also reported increased headache frequency with blurred vision prior to onset. (*Id.*). He denied incontinence. (Tr. 345). He was not driving. (Tr. 346). Dr. Almudallal assessed Mr. Rex with episodic altered awareness with possible partial seizure; he recommended Mr. Rex be evaluated at an epilepsy clinic and arrange for sleep evaluation. (Tr. 348). He was started on Keppra 500 mg twice daily and recommended to avoid alcohol. (*Id.*).

At follow up with Courtney Baller, CNP, on October 10, 2016, Mr. Rex reported continued struggles with depression and anxiety, including panic attacks and social anxiety. (Tr. 388). He becomes agitated frequently, is very depressed, and deals with PTSD. (*Id.*). He has tried several depression and anxiety medications without relief. (*Id.*). He was prescribed Depakote 125 mg twice daily and directed to follow up in two weeks. (Tr. 391).

Mr. Rex followed up with Ms. Freeman on October 24, 2016 for medication management where he had an elevated PHQ-9 score but no current risk of committing suicide. (Tr. 401). He reported having fewer seizures and less desire for alcohol since starting Depakote, but that all sleep meds worsen his restless leg syndrome. (*Id.*). He also reported taking his Chantix as described. (*Id.*). He was assessed as having bipolar disorder, current episode mixed, moderate. (Tr. 403). He was titrated up on Depakote and prescribed Requip. (Tr. 402).

On November 18, 2016, Mr. Rex reported to St. Rita's neurology by phone that his last seizure was six days prior and that they were becoming more severe, and he has experienced urinary incontinence. (Tr. 344). He had been referred to the neurology clinic at University of Toledo Medical Center but was unable to attend the evaluation due to lacking transportation and money. (*Id.*). He had called to see if he could receive services locally but was advised that the

services were not available locally in Lima and he needed to schedule with either Toledo or Ohio

State University. (*Id.*). After admitting he sometimes forgets to take the second dose every day, Mr.

Rex was advised to continue taking Keppra as prescribed. (*Id.*).

On January 9, 2017, Mr. Rex met with NP Baller for a checkup; he brought his

medications in and confirmed he takes them as prescribed. (Tr. 409). He reported his seizures were

improving and he was treating with neurology; he was in the process of getting a renewed referral

for the epilepsy center because he was newly on insurance. (Tr. 410). He was doing well on

Depakote and Requip and requested referral to psychiatry, again because he was newly on

insurance. (*Id.*). NP Baller made the appropriate referrals and recommended follow-up in four

months. (Tr. 413).

On February 23, 2017, Mr. Rex followed up with Dr. Almudallal and reported his

headaches are better but he was still experiencing episodes of altered awareness. (Tr. 340-41). He

denied side effects to his medication. (Tr. 341). Dr. Almudallal was unable to obtain earlier MRI

or EEG results from Mr. Rex's first emergency room visit. (*Id.*). His shaking spells were more

frequent, including while asleep, where he can wake up from sleep incontinence. (Tr. 342). He

reported taking his Keppra regularly, wearing his CPAP machine, and no longer consuming

alcohol. (*Id.*). He was scheduled to be evaluated with the epilepsy clinic at UTMC on March 10,

2017; Dr. Almudallal determined to wait for his workup from this visit. (Tr. 342). He increased

Mr. Rex's Keppra dosage to 750 mg twice daily and recommended no driving, swimming,

operating heavy machinery, or compromising heights until event free for six months. (*Id.*).

At follow up with NP Baller on May 10, 2017, Mr. Rex reported taking his medications as

prescribed. (Tr. 418). He complained of feeling tired all the time, particularly after taking his

medications. (Tr. 419). He had gone from being unable to sleep to sleeping 16 hours daily. (*Id.*). Cardiology had tried to adjust his medications but without result – he had just started the adjusted medications. (*Id.*). He was seeing psychiatry and going to counseling; his psychiatrist had him off work at the time. (*Id.*). Neurology had referred him to the epilepsy clinic in Toledo and he had an appointment scheduled for the end of the month; neurology would not label his seizures until after that appointment. (*Id.*). He was recommended to follow up in one month. (Tr. 424).

On May 19, 2017, Mr. Rex met with neurologist Christopher Hassett, D.O., for evaluation of his seizures. (Tr. 429, 431). He reported having altered awareness and an amnesic period after his seizures, including staring episodes occurring about once per week. (Tr. 431). The episodes were not associated with an aura, lasted about thirty seconds, and had accompanying post ictal confusion lasting one to two minutes. (*Id.*). They had been occurring about three times per month; this frequency was an improvement since starting Keppra and Depakote. (*Id.*). He was assessed as having partial seizures with impairment of consciousness; his Depakote was increased to 500 mg and Keppra continued at 750 mg. (Tr. 432). He was placed on seizure precautions, including no driving, no tub bathing, and no swimming alone. (*Id.*).

On June 13, 2017, Dr. Rhee wrote a letter outlining Mr. Rex's psychiatric treatment history. (Tr. 471). Mr. Rex reported depression, up and down mood, quick temper, agitation, panic attacks, and seizures. (*Id.*). Dr. Rhee indicated Mr. Rex had begun treatment on April 6, 2017; he was recommended to continue taking Depakote and Vistaril as prescribed. (*Id.*). Dr. Rhee added Effexor and recommended counseling, with a follow up in two months. (*Id.*).

Mr. Rex returned for behavioral health treatment with Ms. Freeman on July 21, 2017. (Tr. 702). He reported continuing depression from an inability to control his seizures, fatigue from the

6

medications, and feeling unable to complete tasks due to the medication-induced fatigue. (*Id.*). His neurologist, cardiologist, and psychiatrist had recommended he stay off work but he had been unable to obtain documentation to support his claim for disability. (*Id.*). He had been sober from alcohol for two months, and saw his psychiatrist and his therapist regularly. (*Id.*). His mental status examination was within normal limits except for tearful affect and depressed mood. (Tr. 703).

On August 31, 2017, Mr. Rex returned for follow up with Ms. Freeman at NP Baller's request after a manic episode. (Tr. 721). He reported that he "went manic," felt "on top of the world," did not need sleep or his medications, stopped taking his medications for a week and a half, went on an alcohol binge, and missed several appointments. (*Id.*). He restarted his medications the day before and reported sleeping better, feeling his mood stabilizing, but remaining anxious. (*Id.*). His mental status examination was generally within normal limits, although his judgment was questionable and insight lacking. (Tr. 722). Ms. Freeman assisted Mr. Rex in increasing awareness of his mental health symptoms, as he had acknowledged he does not recognize his manic symptoms until after the fact; he was encouraged to rely on his girlfriend for support in maintaining his medication adherence and keep his providers apprised of his changing mood to prevent such episodes in the future. (*Id.*).

On August 31, 2017, NP Baller wrote a note indicating Mr. Rex had been seen that day and was unable to return to work until further notice due to his medical conditions. (Tr. 1407). She stated he had been taken off work by neurology and cardiology specialists because he was currently undergoing further testing. (*Id.*).

On October 12, 2017, Mr. Rex treated with Ms. Freeman, again at NP Baller's request. (Tr. 730). He reported feeling more depressed and frustrated with his health and personal issues, and

was sleeping more, lacked motivation to do things like work on his car or organize his garage; he reported not drinking alcohol since his manic episode. (Tr. 730). He reported taking his medications as prescribed. (*Id.*). Ms. Freeman noted his seizure disorder was uncontrolled. (*Id.*). His mental status examination was within normal limits but for a tearful affect and depressed mood. (Tr. 731). Ms. Freeman encouraged Mr. Rex to continue biweekly counseling and recommended NP Baller consider increasing his Effexor dosage. (*Id.*).

On December 6, 2017, Mr. Rex met with neurologist Gerald Riess, M.D., who assessed him with partial symptomatic epilepsy with complex partial seizures, intractable, without status epilepticus; the nighttime jerking appeared to be myoclonic jerks. (Tr. 917). Dr. Riess noted Mr. Rex's seizures were poorly controlled and he continued to have mood side effects from Keppra. (*Id.*). Mr. Rex was compliant with taking Depakote 750 mg twice daily and Keppra 750 mg twice daily. (*Id.*). Dr. Riess started him on Lamictal with the intent to increase the dosage to 100 mg twice daily and begin to wean Keppra. (*Id.*). Mr. Rex was warned Lamictal can cause a severe rash requiring instant medical attention. (*Id.*).

On January 17, 2018, Dr. Riess again noted poorly controlled seizures due to medication compliance issues; after restarting a lower dose of Effexor, Mr. Rex's nighttime seizures stopped. (Tr. 946).

At follow up on March 13, 2018, Dr. Riess indicated Mr. Rex's seizures were poorly controlled due to medication compliance issues. (Tr. 943). Mr. Rex reported living in a new house and thought his life should be more stable, allowing him to maintain his medication schedule better. (*Id.*). Dr. Riess stated if Mr. Rex's seizures continued to be poorly controlled despite

medication compliance, he would refer to EMU; otherwise, he should return to the clinic in three months for reevaluation. (*Id.*).

On April 25, 2018, Mr. Rex attended a diagnostic assessment at Coleman Counseling. (Tr. 1087-1111). He reported being prescribed Vistaril, Depakote, and Effexor for his mental health and his seizure disorder, but he was not taking Effexor and only half of the prescribed amount of Depakote because it made him sleep 18 hours a day; without these medications he was sleeping 10 to12 hours a day. (Tr. 1108-09). He was referred for psychiatry services and case management services for assistance with transportation, medication compliance, and connection to community support services such as housing assistance. (Tr. 1109).

On April 27, 2018, Mr. Rex attended counseling at Coleman Counseling; he reported fleeting suicidal thoughts several times a week without plan or intent. (Tr. 1083). He also described having reduced his drinking since his seizures began in 2016. (*Id.*). The social worker recounted that Mr. Rex had risk factors including noncompliance with medications, severe depression, isolative behaviors, difficulty contacting the client (due to unreliability of his phone), homelessness, and difficulty leaving the home. (Tr. 1084). He was recommended to follow up with his PCP regarding medication difficulties while he waited for psychiatry services to restart. (*Id.*).

On May 3, 2018, Mr. Rex attended services at Coleman Counseling. (Tr. 1085). He reported he was homeless and living in a friend's home that was being remodeled. (*Id.*). He was not taking all of his medication as prescribed because he is homeless and because they make him sleep 18 hours. (*Id.*).

Mr. Rex returned to Coleman Counseling on June 6, 2018. (Tr. 1075-78). On examination, he was restless and had fair insight and judgment. (Tr. 1075-76). He reported that

9

because he could not work following his health crises, he has not maintained stable housing and was homeless. (Tr. 1076). He was provided with supportive services; some needed to be arranged in-person because he did not have a working phone. (Tr. 1077-78).

On June 11, 2018, Mr. Rex met with Jessica Ramirez, LISW, at Coleman Counseling and reported that he did not have stable housing, a job, support, a ride to his appointments, or a way to contact people. (Tr. 1073). He presented with increased anxiety and was fidgety. (*Id.*). He reported not taking his medications because they made him too sleepy and he could not work. (*Id.*).

On June 13, 2018, Dr. Riess indicated Mr. Rex's seizures continued to be poorly controlled, in part due to poor medication compliance. (Tr. 940). At the time, Mr. Rex was homeless and had been unable to take his medications for a number of weeks. (*Id.*). He was having one to two seizures per week. (*Id.*). Dr. Riess referred him to an epilepsy monitoring unit (EMU) to better define the type of seizure and determine if he is on the proper medication; potentially treatment with a vagal nerve stimulator would be helpful. (*Id.*). He was recommended to return to the clinic following the EMU evaluation. (*Id.*).

On July 10, 2018, Mr. Rex met with Ms. Freeman and reported being homeless; he had been living in a tent on a friend's property and staying with family members at times. (Tr. 1061). He had not been taking many of his medications because they made him too tired and he could not afford them. (*Id.*). He was taking his nighttime meds and Chantix and had reduced his smoking habit. (*Id.*). He reported all of his specialists were upset that he was not taking his medications. (*Id.*). He was provided with supports to find stable housing and a service dog to help with anxiety and seizures. (*Id.*).

On September 5, 2018, Mr. Rex presented to the emergency department for shortness of breath and anxiety. (Tr. 1014). He reported feeling as if he was about to have another seizure. (*Id.*). He remained alert and oriented during the examination and was discharged after being diagnosed with a panic attack and elevated blood pressure reading. (Tr. 1014, 1020).

On October 16, 2018, Mr. Rex attended behavioral health treatment with Ms. Freeman; he reported being homeless and staying at his mother's or in a tent. (Tr. 1070). He reported high anxiety and mania but had not binged on alcohol and had no desire to drink. (*Id.*). He had not been taking Effexor due to negative side effects but continued taking Prozac and Depakote. (*Id.*). He also reported he had been "unable to arrange transportation via insurance for needed neurological testing." (*Id.*).

That same date, NP Baller treated Mr. Rex for medication refills. (Tr. 1364). During the appointment, Mr. Rex reported continued issues with his seizures and inability to tolerate his medications. (Tr. 1365). He was homeless and staying in a tent or with his mother and had applied for housing assistance. (*Id.*). He reported he had not gone on an alcohol binge for several months. (*Id.*). NP Baller indicated Mr. Rex was "supposed to be seeing a neurologist in Columbus but hasn't been able to get a hold of them to schedule an [appointment]. He also has transportation issues, insurance will not transport him further than 30 miles." (*Id.*).

On December 20, 2018, Dr. Riess received a letter from the Ohio State University Wexner Medical Center updating him as to the status of his referral. (Tr. 921). The letter indicated two telephone calls had been made to Mr. Rex to schedule appointments for the EMU but he was not reached and a letter had been sent requesting he call to schedule. (*Id.*).

On January 23, 2019, Mr. Rex met with NP Baller and reported taking his medications as prescribed. (Tr. 1408). He also reported receiving housing assistance and would be moving soon. (Tr. 1409). He had not completed the neurology testing and was experiencing three to six seizures per week. (*Id.*). NP Baller refilled his prescriptions and recommended he follow up in three months. (Tr. 1412-13).

On April 30, 2019, Mr. Rex attended follow up with Dr. Riess, reporting he was having seizures four to six times per month and his last seizure was three days prior. (Tr. 1418). Dr. Riess noted "some of this is due to poor compliance related to manic episodes but it seems to occur at other times also." (*Id.*). Mr. Rex reported that even when compliant with his medications he still feels as if he has two to six seizures per month. (Tr. 1419). After discussion, Dr. Riess increased Keppra to 1000 mg twice daily and kept Depakote at the same level, and ordered a liver function test to determine if he could increase the Depakote dosage. (Tr. 1418). Dr. Riess also stated, "[s]hould these medicine[s] be ineffective the patient may be a candidate for vagal nerve stimulator or possibly epilepsy surgery." (*Id.*). He recommended Mr. Rex follow up in three weeks. (*Id.*).

On May 22, 2019, Mr. Rex followed up with Dr. Riess to discuss his medications. (Tr. 2241). Dr. Riess indicated Mr. Rex's seizures were poorly controlled with breakthrough seizures when he forgets his medications. (*Id.*). Dr. Riess noted that a "clear side effect" of Keppra caused Mr. Rex to be more angry at times; he started Mr. Rex on Lamictal, continued Depakote, and began weaning off of Keppra. (*Id.*).

At his September 23, 2019 follow up with Dr. Riess, Mr. Rex reported he had a seizure where he fell and hit his head. (Tr. 2234). Dr. Riess indicated that the breakthrough seizure was most likely due to poor compliance in switching from Lamictal to Keppra after he abruptly

12

discontinued Keppra. (*Id.*). Dr. Riess increased Lamictal and continued Depakote with instruction to follow up in one month for reevaluation. (*Id.*).

During a November 26, 2019 visit, Dr. Riess again indicated Mr. Rex's epilepsy was poorly controlled. (Tr. 2230). He reported that since the last office visit he experienced three or four of his typical seizures despite taking Depakote and Lamictal regularly. (*Id.*). Dr. Riess continued Depakote 750 mg twice daily and increased Lamictal to 200 mg twice daily, with a recommendation to return in six weeks for reevaluation. (*Id.*).

On February 4, 2020, Mr. Rex followed up with Dr. Riess, who noted that Mr. Rex's seizures were under good control but he has slightly elevated liver function tests; should this continue to increase, Depakote would need to be discontinued. (Tr. 2226). Mr. Rex's bipolar disorder was also under good control after a change from Lamictal. (*Id.*). He had only three brief spells of altered mental status since his last appointment with Dr. Riess and had experienced no nighttime seizures. (*Id.*). He was recommended to follow up in six months. (*Id.*).

At his six-month follow up appointment with Dr. Riess on August 10, 2020, Mr. Rex reported he was still having breakthrough seizures two to four times per month, typically at night; some had been observed. (Tr. 2215). He continued to take Depakote 750 mg twice daily; Dr. Riess increased this dosage to 1000 mg twice daily with a liver function test in two weeks and clinic follow up thereafter. (*Id.*).

At an October 21, 2020 follow-up, Dr. Riess indicated Mr. Rex's seizures were under good control on Depakote 1000 mg twice daily. (Tr. 2207). Dr. Riess noted that Mr. Rex's liver function tests remained high; after discussion with Mr. Rex, he determined to continue the medication and monitor liver function. (*Id.*).

On April 22, 2021, Mr. Rex attended his six-month follow up appointment with Dr. Riess. (Tr. 2203). At this appointment, Dr. Riess noted Mr. Rex's seizures were improved but he continued to have one to two seizures per month. (*Id.*). Dr. Riess felt it was "very important" to track his liver function and Depakote levels; if they remained in a low therapeutic range, Dr. Riess intended to increase the dose to 1500 mg twice daily. (*Id.*). Mr. Rex did not complain of side effects. (Tr. 2203-04).

On July 22, 2021, Dr. Riess indicated Mr. Rex's seizures were well controlled; he maintained Mr. Rex on the current Depakote dosage and explained the importance of regular blood work to verify no liver damage. (Tr. 2199). He recommended Mr. Rex follow up in six months for reevaluation. (*Id.*).

At a medication review on December 6, 2021, Lindsey Rutter, Pharm. D., observed a noticeable tremor; Mr. Rex reported it had been present for a while but it had worsened recently. (Tr. 2021). Dr. Rutter was concerned the tremor resulted from increasing the Depakote dosage from 1000 mg to 1500 mg. (*Id.*). After consult with NP Baller, Dr. Rutter ordered a Depakote level test. (*Id.*).

At six-month follow up on January 24, 2022, Dr. Riess noted Mr. Rex's seizures were "under acceptable control," with only two seizures since the last office visit. (Tr. 2183-84). He noted the tremors were likely a side effect of Depakote, although Abilify could cause similar tremors. (Tr. 2183). Depakote levels were normal or slightly subtherapeutic, but Dr. Riess did not think he could decrease the dosage without causing more seizures, as Mr. Rex had been on multiple other medications to control his seizures but those were ineffective. (Tr. 2183-84). After

14

discussion, Dr. Riess determined to increase gabapentin to control the tremors, help with pain, and potentially use as seizure prophylaxis. (Tr. 2183).

On March 10, 2022, Mr. Rex's symptoms were the same – reduction in seizures but with essential tremor due to Depakote dosage; Dr. Riess determined that treatment would continue at the same level and recommended follow up in six months. (Tr. 2175).

III. **MEDICAL OPINIONS**

On October 2, 2017, Mr. Rex underwent a psychological evaluation with Michael Wuebker, Ph.D. (Tr. 637-43). Dr. Wuebker diagnosed Mr. Rex with bipolar disorder and anxiety disorder; he also indicated cannabis and alcohol use disorders were likely. (Tr. 642). In his functional assessment, Dr. Wuebker opined Mr. Rex could understand and apply instructions for one-step and a few complex workplace instructions, and would likely benefit from assistance in managing his funds due to substance use issues. (Tr. 642-43). Dr. Wuebker did not indicate Mr. Rex had other significant limitations in his functional abilities. (*See id.*).

On October 5, 2017, at the initial level, state agency reviewing psychologist Katherine Reid, Psy.D., found Mr. Rex retained the ability to perform in a routine work setting where significant changes in job duty could be explained in advance to allow for adequate adjustment. (Tr. 91). On November 14, 2017, also at the initial level, state agency reviewing physician Lynne Torello, M.D., found Mr. Rex could work at a medium exertional level with additional restrictions, including lifting, carrying, and pulling 50 pounds occasionally and 25 pounds frequently, and further limited to standing/walking for no more than six hours and sitting for six hours out of an eight-hour workday. (Tr. 88-90). Dr. Torello opined Mr. Rex could never climb ladders, ropes, or scaffolds, and to avoid all exposure to unprotected heights, hazardous

machinery, and commercial driving, due to his seizure activity. (Tr. 89-90). Dr. Torello also opined Mr. Rex must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 89). Dr. Torello indicated this RFC was based in part on his history of absence seizures and drinking spells in which he stops taking his medications. (Tr. 90).

At reconsideration on January 23, 2018, state agency psychologist Kristen Haskins, Psy.D., affirmed Dr. Reid's findings. (Tr. 127-28). And on January 24, 2018, state agency reviewing physician Elizabeth Das, M.D., affirmed Dr. Torello's findings. (Tr. 125-27).

## IV.   ADMINISTRATIVE HEARING

At the second hearing before the ALJ on June 7, 2022, Mr. Rex testified he lived alone in an apartment; his bills were covered by government benefits. (Tr. 1493-94). His seizure disorder prevents him from obtaining a valid driver's license; he has friends drive him to appointments and the grocery store. (Tr. 1495). He can perform his own self-care and hygiene. (*Id.*). He gives his niece a grocery list and she will shop for him. (Tr. 1498). He smokes cigarettes and marijuana; he does not have a medical marijuana card because he cannot afford one. (Tr. 1500). He had not worked for the past six years; the ALJ adopted the following jobs as past relevant work: rough carpenter, finish carpenter, carpenter supervisor, and nailing machine operator. (Tr. 1496).

Mr. Rex testified his seizures prevent him from working; his medications cause him to sleep 12 to18 hours a day. (*Id.*). He also testified he could not stand for long or walk far distances and was "panicky" around people. (*Id.*). He does not leave the house often and will not go around large groups of people unless necessary. (Tr. 1497). He can only walk for five minutes or sit for an hour before needing to reposition; he can lift up to ten pounds. (Tr. 1497-98). He could not

16

perform a seated job unless he was permitted a sit/stand option. (Tr. 1501). He sees a neurologist,
counselor, psychiatrist, and a doctor for his back and is compliant with their treatment
recommendations. (Tr. 1497).

Mr. Rex has seizures four times a month. (Tr. 1501). There are no signs accompanying
seizure onset. (*Id.*). After a seizure, Mr. Rex is "out of it," "can't hardly talk," and "can't think," so
he will just sleep the rest of the day. (Tr. 1501-02). He cannot complete chores on days when he
has a seizure. (Tr. 1504). He also has tremors in his hands; he will spill things while trying to drink
and food will fall off his fork when he tries to eat. (Tr. 1502). He also experiences anxiety and
panic attacks when he goes out in public. (Tr. 1502-03). He has problems with attention and
concentration; he zones out while watching TV and needs reminders to complete tasks. (Tr. 1503-
04).

The medical expert (ME) then testified; as a neurologist, he could not opine as to Mr. Rex's
mental health conditions but was present at the hearing to talk about Mr. Rex's neurological
conditions and seizure disorder. (Tr. 1505). The ME found both epilepsy and a skeletal spine
disorder were medically determinable impairments, but neither condition met listing
requirements. (Tr. 1506). In the ME's opinion, Mr. Rex's seizure disorder required limitations
under usual seizure precautions such as: no heights; no climbing ladders, ropes, or scaffolds; no
driving until at least six months seizure-free; no work with heavy machinery; and no swimming or
bathing alone. (Tr. 1507). As to the skeletal spine disorder, the ME opined Mr. Rex could carry
ten pounds continuously and twenty pounds occasionally, stand one hour, and sit six hours of an
eight-hour working day. (Tr. 1507-08). The ME also testified Mr. Rex had no manipulative
limitations, he did not need a cane to ambulate, and had no vision problems; he had no

limitations with humidity but could only tolerate occasional exposure to fumes and odors; he could not be exposed to extreme cold, heat, or loud noise. (Tr. 1514). The ME also testified the seizure disorder itself would not cause Mr. Rex pain or fatigue, but that medications such as Abilify may affect his alertness and the high dosage of Depakote may cause some sedation. (Tr. 1515). However, the ME's review of the record indicated that Mr. Rex had not complained of sedation during neurology visits, unlike his complaints of tremor, which might be attributable to the Depakote dosage. (Tr. 1515-16). The ME also noted Mr. Rex had anger issues while taking Keppra. (Tr. 1516).

The VE then testified that a hypothetical individual of Mr. Rex's age and limitations outlined in the RFC decision, *i.e.*, someone who is

> limited to frequent climbing ramps and stairs. No climbing ladders, ropes, or scaffolds; no exposure to extreme cold or heat, wetness, or humidity; no exposure to concentrated fumes, odors, dust, and gases; no exposure to unprotected heights and dangerous moving machinery; no commercial driving; capable of understanding, remembering, and carrying out simple tasks that are not fast-paced meeting the pace of productivity is not dictated by an external source over which he has no control; occasional interaction with coworkers; no interaction with the public; and limited to work routine that is repetitive from day-to-day with few and expected changes. He is limited to frequent handling and fingering.

(Tr. 1440) could not perform Mr. Rex's past work. (Tr. 1520-21). But the person could work as a cleaner, housekeeping; merchandise marker; or routing clerk. (Tr. 1521). A need to work in isolation, away from all others, would be work preclusive. (Tr. 1522). Employers tolerate off-task behavior up to 15% and one absence per month on an ongoing basis. (Tr. 1522-23). No absences would be tolerated during a probationary period. (Tr. 1524).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration

requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Rex had not engaged in substantial gainful activity since September 30, 2016, the alleged onset date. (Tr. 1435). At Step Two, the ALJ identified the following severe impairments: chronic diastolic heart failure; hypertension; coronary artery disease; chronic obstructive pulmonary disease (COPD); obstructive sleep apnea; seizure disorder; obesity; degenerative disc disease; restless leg syndrome; bipolar disorder; anxiety disorder; alcohol use disorder; cannabis use disorder; and cigarette nicotine dependence. (*Id.*).

At Step Three, the ALJ found Mr. Rex does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (*Id.*). Specifically, the ALJ considered Listings 1.15, 1.16, and 1.18, related to spine disorders, and found Mr. Rex did not meet these listings because he did not require the use of an assistive device. (Tr. 1436). The ALJ also considered Listings 3.02 (COPD) and 3.03 (chronic pulmonary insufficiency) and determined that Mr. Rex's COPD, obstructive sleep apnea, and cigarette/nicotine dependence are not of listing level severity. (*Id.*). The ALJ also determined Listings 4.02 and 4.04 were not met because Mr. Rex had no current signs of inadequate cardiac output, pulmonary congestion, or anginal syndrome at rest. (*Id.*). She found Mr. Rex's restless-leg syndrome did not meet Listing 11.00. (Tr. 1437). Regarding Listing 11.02 (seizure disorders), the ALJ stated the following:

> Turning to Listing 11.02, there is no evidence of generalized tonic-clonic seizures, occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment, or dyscognitive seizures, occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment, generalized tonic-clonic seizures, occurring at least once every 2 months for at least 4 consecutive months despite adherence to prescribed treatment (and a marked

20

limitation in one of the following: physical functioning; or understanding, remembering, applying information, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing oneself). Thus, the claimant's seizure disorder is not of listing level severity.

(*Id.*). The ALJ also found Mr. Rex's obesity did not medically equal the severity of a listed impairment. (*Id.*). After considering Listings 12.04, 12.06, 12.08, 12.15, the ALJ found that Mr. Rex's mental health impairments did not cause at least two "marked" or one "extreme" limitation and thus the Paragraph B criteria of these listings were not met; neither were the Paragraph C criteria. (Tr. 1438-40).

The ALJ determined Mr. Rex's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except He is limited to frequent climbing ramps and stairs. No climbing ladders, ropes, or scaffolds; no exposure to extreme cold or heat, wetness, or humidity; no exposure to concentrated fumes, odors, dust, and gases; no exposure to unprotected heights and dangerous moving machinery; no commercial driving; capable of understanding, remembering, and carrying out simple tasks that are not fast-paced meeting the pace of productivity is not dictated by an external source over which he has no control; occasional interaction with coworkers; no interaction with the public; and limited to work routine that is repetitive from day-to-day with few and expected changes. He is limited to frequent handling and fingering.

(Tr. 1440).

At Step Four, the ALJ found Mr. Rex could not perform his past relevant work as a rough carpenter, finish carpenter, carpenter supervisor, or nailing machine operator. (Tr. 1457). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Mr. Rex can perform, including cleaner/housekeeper, merchandise marker, and routing clerk. (Tr. 1458). Therefore, the ALJ found Mr. Rex was not disabled. (*Id.*).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court

22

interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Mr. Rex's sole argument on appeal is that the ALJ's RFC determination does not accurately account for Mr. Rex's severe seizure disorder. (Tr. 2940). He contends the ALJ did not adequately "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." (*Id.*). As he argues, the ALJ was directed on remand to address more carefully the impact his seizure disorder had on his ability to work, including considering the difficulties he experienced in maintaining treatment such as his co-occurring

23

bipolar disorder and the financial and housing instability that affected his ability to obtain treatment at a consistent and therapeutic level. (*Id.* at PageID 2942-44). Even so, however, he contends the ALJ failed to discuss Mr. Rex's seizure disorder, his treatment, his issues with medication compliance, and his financial and housing issues limiting his ability to obtain regular treatment in such a way that the reviewing court can understand. (*Id.* at 2940-41).

In contrast, the Commissioner contends the ALJ's decision was supported by substantial evidence. (ECF #10, PageID 2954). He asserts the ALJ sufficiently discussed the relevant factors when determining the RFC, including Mr. Rex's treatment history, routine daily activities, prior administrative medical findings, opinion evidence, and medical expert testimony, as well as the sedative and tremor side effects of his medications, and factors related to his noncompliance with treatment. (Tr. 2955-60).

After review, I conclude the ALJ did discuss the relevant evidence necessary when making her RFC determination. But I also find the discussion fell short of providing a thorough analysis and failed to create the necessary logical bridge for this Court's review. I therefore recommend the District Court remand for the reasons outlined below.

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ alone determines a claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c). The RFC must be based on all relevant evidence in the record, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010).

The RFC is an assessment of the claimant's remaining capacity for work once all limitations have been considered. *Id.* at 632. An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* In other words, the RFC assessment is based on the evidence of record and the ALJ's evaluation of the consistency of the claimant's statements regarding symptoms, *i.e.,* the SSR 16-3p analysis.

SSR 16-3p outlines a two-step process an ALJ is to follow when evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second stage, recognizing that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence, the ALJ considers the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and

any other relevant evidence in the individual's case. *Id.* In addition, the ALJ uses the factors set forth in 20 C.F.R. §§ 404.152I)(3) and 416.929(c)(3) to evaluate the individual's statements:

1. A claimant's daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See, e.g.,* *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds those complaints are inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. However, the ALJ will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. SSR 16-3p, 2017 WL 5180304, at *5. Similarly, the ALJ may not reject an individual's statements about his symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged but

must carefully consider other evidence in the record. *See* 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2); *see also* SSR 16-3p, 2017 WL 5180304, at *6.

The ALJ must explain which of an individual's symptoms are consistent or inconsistent with the evidence of record and how the ALJ's evaluation of the symptoms led to his conclusions. SSR 16-3p, 2017 WL 5180304, at *9. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ must limit his evaluation "to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments." *Id.* at *11. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

This final analysis is where I find the ALJ has erred. Although the ALJ provides an overview of Mr. Rex's seizure disorder and its related symptoms, treatment, treatment compliance, and side effects of his medications, I find the ALJ did not sufficiently analyze these factors in a "consistent" and "clearly articulated" fashion such that the District Court, as the subsequent reviewer, can properly assess how the ALJ considered Mr. Rex's symptoms. *See* SSR 16-3p, 2017 WL 5180304, at *10-11.

The ALJ provided the following overview of Mr. Rex's seizure disorder when making her RFC findings:

> The reasons for the above finding will be discussed after a brief overview of the claimant's alleged symptoms, impairments, and limitations. . . .

27

The claimant testified that he still gets seizures about four times a month and there are no warning signs the occur leading up to his seizure. The claimant described feeling "out of it," after a seizure, where he can "hardly talk" or think and "everything is all fuzzy." The claimant related at the hearing that he typically sleeps after he has a seizure and he is "out of it." The claimant also related that he has tremors that occur "all the time" and affect his ability to grip and grasp; the claimant stated that he can hardly use a fork or spoon because "everything falls off," and he has difficulties drinking. . . .

The claimant reported having medication side effects including tiredness, dizziness, lack of concentration, nausea, and irritability.

(Tr. 1441) (citations omitted). The ALJ then explained:

Although the medical evidence establishes that presence of multiple impairments that could reasonably be expected to produce a certain degree of symptoms, the pivotal question is not whether such symptoms exist, but whether these symptoms occur with such frequency, duration, and/or severity as to reduce the claimant's residual functional capacity to that which has been set forth above, or, if they are of such severity as to preclude the claimant from any and all work activity on a regular and continuing basis. To answer this question, the undersigned has reviewed and considered the complete medical history consistent with 20 CFR 404.1512(d) and 416.912(d), including evidence from the period prior to the claimant's alleged onset date. There is no evidence to support any disabling functional limitation prior to the claimant's date last insured.

(Tr. 1442). Subsequently, the ALJ provided the following review:

The claimant also has a seizure disorder. The claimant's representative argued the frequency and severity of the claimant's seizures would not permit the claimant to sustain competitive employment and the residual functional capacity did not adequately account for his severe impairments. Prior to his alleged onset date, in June 2016, the claimant reported having an episode when he was backing out of his car and experienced time where he did not remember what happened; the claimant ended upon in the parking lot across the street. Evaluation at that time showed normal physical examination findings, as he was alert, oriented person, place, and time, neurovascularly intact, and exhibited full range of motion and had no motor or sensory deficits. The claimant established care with Warren Morris, M.D., and he was referred for neurology and cardiology consultations. He requested to have all his medications re-started. His symptoms have been managed with medications, including ProAir FHA, Coreg, Plavix, Pravachol, and Symbicort. The claimant was scheduled to see his neurologist in August 2016. In October 2016, the claimant reported to Ms. Baller that he was struggling with his depression and anxiety, as well as severe panic attacks and social anxiety. He was frequently agitated and dealing with PTSD. The claimant was taking Keppra at that time, and he disclosed

that his seizures were "somewhat controlled, yet he continued to have a mix of depression, anxiety, However, since being on Depakote, the claimant had fewer seizures and less desire for alcohol. Consistent with his reports, Ms. Freeman observed the claimant appeared well-groomed, cooperative, calm, with clear speech, logical thought processes, average intelligence, normal judgment and insight, and tearful affect and depressed mood. Ms. Freeman and his primary care provider discussed increasing the claimant's Depakote and added Requip to his medication regimen . . . The claimant disclosed that he had medical insurance coverage in January 2017, and he was in the process of getting referred back to the epilepsy clinic; the claimant was doing well on Depakote and Requip. His seizures were improving and he was doing well on Depakote. . . .

The claimant later followed up with Christopher Hassett, M.D., a neurologist, in May 2017. Dr. Hassett increased the claimant's Depakote dosage to 500 milligrams two times a day and he continued taking Keppra 750 milligrams two times a day. He recommended the claimant undergo a long-term monitoring for epilepsy (LTME) evaluation, given the claimant's reports that his seizures were happing more than three times a month. He gave seizure precautions, including no driving, no tub bathing, and no swimming alone. Shortly before his date last insured, the claimant reported to Dr. Riess that he had mood-related side effects from taking Keppra; Dr. Riess modified his medication regimen and started the claimant on Lamictal and then weaned the claimant off Keppra. After the date last insured, the claimant continued receiving symptoms of complex partial epilepsy. The claimant was taking Lamictal 50 milligram twice a day. Dr. Riess wanted the claimant to follow up at an epilepsy monitoring unit to decide whether to consider more aggressive treatment, such as a vagal nerve stimulator or even seizure surgery. The claimant was referred to the Ohio State University Wexner Medical Center's epilepsy monitoring unit, but the claimant was unable to be reached. During the relevant period, there were times the claimant reportedly was not taking his medication as recommended.

As directed by the remand order, the undersigned was directed to consider the mitigating factors set forth in Social Security Ruling 16-3p. The undersigned considered the relationship between the claimant's bipolar disorder and epilepsy, the deterrent effects of financial limitations or disabling side effects at all. For example, the claimant argued that his non-compliance with treatment was the result of his bipolar disorder. The claimant reported having manic episodes that can last days and cause him to go off his medications and he does not sleep. As chronicled in the record, the claimant also reported having various reasons contributing to his inability to consistently take his medications. For example, there were times, when the claimant had simply not started his medications. For example, while Dr. Riess had increased his Depakote dosage on September 28, 2017, the claimant admitted that he had not started his new prescription for Depakote because he had not made it to the pharmacy. In August 2017, the

claimant reported being manic "a couple of weeks ago," and he started drinking every day and "quit all of his meds." Dr. Rhee increased the claimant's Effexor dosage and he felt that his mood was more stable, though he still felt very anxious.

The claimant indicated there were financial barriers. For example, after his date last insured, the claimant related to Dr. Pere in January 2018, that he could not afford his medications. The claimant moved into a new house by March 2018; during the move, the claimant reportedly lost his medications over a week and had some breakthrough seizures. The claimant disclosed to Ms. Baller that since he had been off of his medications, he was having more seizures. He was living in a new house and said that his wife is more stable and he should be able to maintain his medication schedule. In April 2018, at his diagnostic assessment, the claimant stated that he was last experienced a manic episode when he moved. In June 2018, the claimant disclosed that he had been homeless and had not been taking his medicine for a few weeks. He had been unable to continue on Lamictal "for logistical reasons," though he had been on his Keppra and Depakote medications for about two weeks. The claimant alleged having 1-2 seizures a week. The claimant related in July 2018, that he had been manic due to being off most of his medications and he was hopeful about finding housing so he could restart his medications. Even during this time, he appeared grossly oriented to person, place, and time. The claimant continued to have issues with stable housing, as he was occasionally staying in a tent and occasionally staying with his mother. He was supposed to follow up with a new neurologist but he had transportation issues. Dr. Riess noted in April 2019, the claimant continued to report having 2 to 6 seizures per month, which was due to poor compliance related to manic episodes, but it also "seems to occur at other time also." Dr. Riess increased his Keppra dosage to 1000 milligrams at that time and his Depakote dosage remained the same. The claimant maintained medical insurance coverage in August 2019. He disclosed that he did well with medications, though he missed his morning dosages "here and there," and his medications made him feel tired.

Pursuant to Social Security Ruling 16-3p, the undersigned has also considered the effects of the claimant's side effects. For example, the claimant has reported that his medication causes somnolence, and he testified that he slept up to 12 hours a day. However, prior to his date last insured, the alleged frequency of his persistent uncontrolled seizures and the extent of his hypersomnolence is not consistent with the totality of the evidence, The effects of the claimant's alleged somnolence are not consistent with the examination findings of the claimant's own treating providers as chronicled in his own neurological and mental treatment records, emergency room visits, and diagnostic testing reports. There is no evidence of significant lethargy, inattention, or lack of focus, which would be expected given the claimant's alleged side effects. Various treating and examining providers observed findings that were benign or disproportionate to the alleged intensity, severity, and frequency of his allegations. For example, when the claimant

established treatment with Dr. Hassett, the claimant described having seizures as altered awareness and amnesic periods. His girlfriend mentioned that he would wake her up with the shaking of his right leg and arm, with occasional episodes of urination. He also reported having staring spells where he did not respond to people around him, which were triggered by stressed and occurred once or three times a month.

(Tr. 1443-45) (citations omitted). The ALJ further stated:

On October 12, 2017, the claimant reported that he was still experiencing break through seizures. However, the claimant was grossly oriented to person, time, and place, had intact judgment and insight, normal mood, and appropriate affect.

Although the claimant has reported worsening symptoms at times, his treatment providers addressed these episodes promptly and sufficiently with adjustments to his medications. The claimant's Lamictal dosage was adjusted and he still took Depakote, but he was being weaned off Keppra because it caused him to be angry. At that time, the claimant was grossly oriented person, place, and time, with intact insight and judgment, normal mood, and appropriate affect.

Even during periods, when the claimant was admittedly not taking medications, the positive objective clinical and diagnostic findings, and activities of daily living still do not support more restrictive functional limitations than those assessed herein. For example, in March 2018, when the claimant had been off of his medication due to a move, Dr. Riess observed the claimant had normal speech, attention, orientation and memory. The claimant's gait was within normal limits. He related that he would be better able to maintain his medication schedule. The claimant reported in April 2018, that he still had bad seizures where he cannot talk or reason and his mild seizures were more frequent, particularly when he sleeps; however, he allegedly refused to go to the emergency department.

In April 2018, the claimant reported that he stopped taking Depakote and Effexor because it was making him sleep 18 hours a day.

The claimant stated that he was not taking all of his medications because they made him sleep 18 out of 24 hours in a day. He was no longer taking his morning medications, and he typically slept 10 to 12 hours.

Laboratory results showed the claimant's Depakote levels were good. The claimant related that he had two big seizures, but he did not injure himself. Follow-up treatment notes in December 2020, showed the claimant's Depakote levels were still at therapeutic levels and there were no changes recommended for his Depakote dosage. The claimant was reportedly doing well with consistently taking his medications, both in the morning and the evening and he denied using alcohol.

The record shows the claimant has been in treatment on a consistent basis. The claimant's Depakote levels were "good," with no changes made to his Depakote dosage. He was doing well "with consistency with his meds, taking both morning and night medications. . . The claimant's Depakote levels in December 2021, were within normal limits. He still has a tremor, but he has not had any seizures in the past month.

The claimant's gabapentin dosage was increased to help his tremors. The claimant's seizures remained improved and were only occurring once a month. Consistent with the claimant's reports, the record supports the claimant has tremors. Lindsey Rutter, R.P.H., observed in December 2021, had a noticeable tremor, which had been thought to be associated with his Depakote. In January 2022, the claimant still had a tremor, but he had not had any seizures in the past month. Dr. Riess noted in January 2022, the claimant's seizures were under acceptable control. His tremors were likely a side effect of his Depakote, although Abilify could cause the same similar tremors. Depakote level was normal or slightly subtherapeutic. He did not feel that the claimant's Depakote dosage could be decreased without bringing on more seizures. Since the last office visit, he only had 2 seizures, which is marked improvement for him. He has somewhat greater hand tremors, but his most recent Depakote level was slightly subtherapeutic at 26 mg/dL. Liver function testing was within normal limits. In March 2022, Dr. Riess noted the claimant's seizures and meralgia paresthetica were under good control, and tremors were a side effect of Depakote, which had been the only medication effective in managing his symptoms; Dr. Riess stated that a lower dose of Depakote could cause breakthrough seizures. The claimant had no seizures and his meralgia paresthetica improved on the higher dose of gabapentin. While the claimant still had tremors, the claimant felt that his tremors did not affect him greatly. Dr. Riess observed the claimant had an irregular distal tremor with both hands extended and normal gait. Mental status was within normal limits for speech, cognition, orientation, general fund of knowledge, attention, and memory. Dr. Riess recommended the claimant followed up in six months for follow-up. The claimant continues to be under medication management, though symptoms have been stable.

(Tr. 1446-50) (citations omitted).

Here, despite the extensive discussion of Mr. Rex's seizure disorder, I conclude the ALJ did not properly provide the requisite analysis to support her conclusions. For example, there are numerous instances where the ALJ uses normal mental status examination findings to determine Mr. Rex's seizure symptoms are not as severe as alleged. In one instance, the ALJ noted:

However, Dr. Hassett observed the claimant ambulated independently. The claimant's neurological examination was non-focal, other than the claimant's

anxiety. The claimant was oriented person, place, and time, with appropriate mood
and affect. The claimant had intact recent memory and he could appropriately
name objects. The claimant had a normal cranial nerve examination, and normal
muscle bulk and tone in the bilateral upper extremities. He demonstrated normal
finger-to-nose and rapid alternating movements, had normal vibration position and
light touch, and normal gait and station. Dr. Hassett concluded the claimant like
[*sic*] had partial seizure with impairment of consciousness.

(Tr. 1445-46). The ALJ also noted: "For example, in March 2018, when the claimant had been off

of his medication due to a move, Dr. Riess observed the claimant had normal speech, attention,

orientation and memory. The claimant's gait was within normal limits." (Tr. 1445-46). Elsewhere,

the ALJ stated: "His seizures were improving and he was doing well on Depakote. Dr. Rovner

observed in early 2017, the claimant had normal mood, affect, behavior, judgment and thought

content and was oriented to person, place, and time." (Tr. 1444).

The ALJ's discussion relative to ambulation, muscle bulk, and related mental health

findings does not appear relevant to the pertinent inquiry of whether Mr. Rex's *seizures* are "benign

or disproportionate to the alleged intensity, severity, and frequency of his allegations." (Tr. 1445).

Rather, Mr. Rex appears to have significant difficulty over time in managing the effects of his

seizure disorder. Mr. Rex has had periods of waxing and waning intensity of his seizures; some of

these have been due to poor compliance with his medications – although Dr. Riess also notes, and

the ALJ acknowledges, that breakthrough seizures continue to occur at times when he is

compliant. (Tr. 1445, 1418) ("The patient continues to have between 2-6 seizures per month.

Some of this is due to poor compliance related to manic episodes but it seems to occur at other

times also."). And although Mr. Rex eventually gained some control of his seizures while on a high

dosage of Depakote, he continued to experience breakthrough seizures at the rate of approximately

one or two per month. (Tr. 2203). He also experienced associated hand tremors and was under

33

close monitoring for liver function. (*See, e.g.*, Tr. 2023, 2021, 2183, 2207). And, while his provider noted his seizures were under good control, he was also concerned about the side effects of the medication but did not feel it appropriate to reduce Mr. Rex's Depakote dosage due to tremor or liver function because a lower dose would likely cause breakthrough seizures. (Tr. 2175).

This discussion of mental status examination results, limited discussion of continued seizures, and serious medication side effects in the context of seizure activity raises the question as to whether the ALJ has properly engaged with the record evidence in a manner meaningful to each of Mr. Rex's co-occurring mental and physical impairments. Thus, I find a failure to create a logical bridge between the evidence and result sufficient to guide my review, which leads me to recommend remand.

The Commissioner also argues this Court should reject Mr. Rex's argument that the ALJ failed to consider his issues with receiving care because of his inability to afford treatment and homelessness. (ECF #10, PageID 2959). I decline to do so because this inability appears to be a major factor in Mr. Rex's receipt of consistent and, at times, specialized treatment for his epilepsy. I also find the Commissioner's reliance on *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 120 (6th Cir. 2016), inapposite at best. The Commissioner cites this case for the proposition that "the Sixth Circuit held that a claimant must not only have a subjective inability to afford treatment, but must actively seek treatment from low- or no-cost care providers in his neighborhood and be turned away." (ECF #10, PageID 2959) (citing *Dooley*, 656 F. App'x at 120). The Commissioner also includes the parenthetical explanation of "[r]ejecting plaintiff's argument that the ALJ erred in drawing a negative inference from non-compliance where '[p]laintiff cites to no evidence that indicates that [a health care provider] was unwilling to provide him with' treatment despite the

record reflecting his difficulty 'affording even basic primary care.'" (*Id.*). I do not find the same

support for the Commissioner's proposition in *Dooley*. The quoted section, in full, states:

> Dooley contends that because "the record reflects" that he had difficulty "affording
> even basic primary care, the ALJ should not have drawn an adverse inference from
> his failure to visit a specialist or to seek more aggressive treatment options." This
> argument fails because Dooley received medical treatment at the Church Health
> Center even though he lacked health insurance. Further, Dooley was able to
> borrow money from family and friends to pay the $25 to $35 fee that the clinic
> charged him for each visit. Dooley also testified that the Church Health Center
> continued to treat him even though the clinic was "not supposed to" and that the
> clinic had donated Dooley's insulin costs for his most recent month. Dooley cites
> no evidence that indicates that the Church Health Center was unable or unwilling
> to provide him with more aggressive treatment options for his pain and other
> symptoms. The ALJ therefore had an adequate basis for concluding that Dooley's
> subjective complaints were not fully consistent with the record.

*Dooley*, 656 F. App'x at 120.

This excerpt makes patent that the Sixth Circuit considered it important that the claimant

alleged error for the ALJ drawing an adverse inference from an inability to pay for specialized care,

but the claimant in *Dooley* did not seek that more aggressive and specialized care from a local

affordable clinic. This does not translate into the proposition that the Sixth Circuit *held* a claimant

must *seek and be turned away from* affordable neighborhood services. Moreover, that is not what

happened in Mr. Rex's case. In fact, he often sought treatment from a local neurologist but was

told he needed specialized care only available elsewhere. The record confirms that at least two

neurologists in Lima indicated Mr. Rex's seizures needed more specialized care than was available

locally and referred him to epilepsy centers at Ohio State University in Columbus or University of

Toledo Medical Center for further evaluation and treatment. (*See, e.g.*, Tr. 344, 348, 419, 943).

Furthermore, the record reflects the following exchange on November 18, 2016, between Mr. Rex

and his providers at St. Rita's in Lima:

> [Mr. Rex's] last seizure was 6 days ago. He reports they are getting more severe and he has experienced urinary incontinence with his seizures. I asked if he followed up with UTMC neurology as we referred him there and he stated he did not have the money to make a trip up there. He is wondering what else can be done for him locally. Please advise.
>
> [Mr. Rex] needs to be evaluated by epilepsy clinic to determine the appropriate management for these events and those services are not available locally. Will need to get him scheduled with Toledo or OSU.

(Tr. 344). Notably, cost is not the only barrier for Mr. Rex to receive these specialized services. He had been placed on driving restrictions until he was six months seizure-free. (Tr. 342, 432). But he has not been able to return to driving; even when his seizures are better controlled, he experiences a breakthrough seizure about once or twice per month. (Tr. 2203). Thus, affordability may be a factor, not only for the services themselves, but even as a barrier to transporting himself to the services.

The ALJ does little to discuss this barrier to care. She indicates Mr. Rex was referred to the Ohio State Wexner Medical Center EMU, but only notes the letter from the EMU to Dr. Riess indicating two unsuccessful telephone calls to Mr. Rex. (Tr. 1444) (citing Tr. 921). She does not discuss, in this context, that he had attempted to reach out for appointment but was unable to schedule – despite citing this same page on the record elsewhere in her decision. (*See* Tr. 1365). She also discusses financial barriers, but only in the context of obtaining his medications. (*See* Tr. 1444-45). Where the ALJ discusses transportation barriers, she states "he was supposed to follow up with a new neurologist but he had transportation issues." (Tr. 1445) (citing Tr. 1070, 1365). Looking to these records, both refer to him being unable to arrange transportation from Lima to the specialists outside of the area: Patient "has been unable to arrange transportation via insurance for needed neurological testing" (Tr. 1070) and "is supposed to be seeing a neurologist in

Columbus but hasn't been able to get ahold of them to schedule an [appointment]. He also has transportation issues, insurance will not transport him further than 30 miles." (Tr. 1365). Despite adverting to these barriers to treatment, it does not appear the ALJ fully engaged with Mr. Rex's barriers to treatment as SSR 16-3p requires. ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. . . . We will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them.").

Ultimately, the ALJ concluded the RFC was sufficient to support Mr. Rex's abilities and provides a concluding paragraph as to the limited range of light work he could perform. (Tr. 1456). But this discussion is insufficient to support Mr. Rex's RFC determination and minimizes the real effects of his condition, the side effects of his medication, and the significant barriers in front of him when seeking care. Therefore, I recommend the District Court remand.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: March 29, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).